**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AUTOCAM MEDICAL DEVICES LLC, and
SOUTHEASTERN TECHNOLOGY, INC.,

             Plaintiffs,

v.

WHITE'S BRIDGE TOOLING, INC., and
PETER ODLAND**,**

             Defendants.

Case No.

Honorable

---

Deborah J. Swedlow (P67844)
Patrick L. Rawsthorne (P81676)
Honigman LLP
200 Ottawa Ave. NW
Suite 700
Grand Rapids, Michigan 49503
(616) 649-1900
bswedlow@honigman.com
prawsthorne@honigman.com

*Attorneys for Plaintiffs*

---

## <u>VERIFIED COMPLAINT</u>

Plaintiffs Autocam Medical Devices LLC ("AMD") and Southeastern Technology, Inc. ("Southeastern" and, together with AMD, "Plaintiffs") bring this civil action against Defendants White's Bridge Tooling, Inc. ("White's Bridge") and Mr. Peter Oland ("Oland" and, together with Defendant White's Bridge, "Defendants"), seeking damages, attorneys' fees, and injunctive relief for violations of the Defend Trade Secrets Act (18 U.S.C. § 1836), the Michigan Uniform Trade Secrets Act § 445.1901 *et seq.*, and for breach of contract. For their Verified Complaint, Plaintiffs hereby state and allege, upon personal knowledge with respect to themselves, and upon information and belief as to other matters, as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this action seeking injunctive and monetary relief against Defendants for their unlawful misappropriation of Plaintiffs' trade secrets and for Defendants' breaches of multiple contractual obligations.

2.      Plaintiff AMD is a contract manufacturer of precision-machined surgical drill bits, drivers, screws, plates, cutting tools and other complex, highly engineered surgical implants, instruments, and handpieces, as well as other device components.  Its proprietary innovations to the manufacturing processes for these products have made the Kentwood, Michigan-based company an industry leader, placing it at an advantage over its competitors.

3.      Plaintiff Southeastern is a wholly owned subsidiary of AMD that AMD acquired in 2014.  Plaintiff Southeastern works with AMD to develop the technologies and processes that have driven those companies' successes in their industry.

4.      One of the proprietary innovations that has helped make Plaintiffs industry leaders are machines that, after preliminary processes including machining and heating treating, automatically straighten surgical drill bit blanks to within precise specifications.  The machines were revolutionary from a price-advantage perspective because they automated a task that once required intensive human labor.  Through their proprietary designs and controls, Plaintiffs have streamlined the manufacturing process, significantly lowered costs, and in turn given themselves a distinct competitive advantage in the market.  Since Plaintiffs first created these automatic straightening machines, Plaintiff AMD has made further advancements and modifications to the machines' design and controls that improved their utility and efficiency.

5.      The machines' initial designs, as well as Plaintiff AMD's proprietary modifications to the designs and controls, derive independent economic value from not being generally known

to or not being readily ascertainable by proper means by others, including other competitors and potential competitors, who could obtain economic value from their disclosure and/or use.  Indeed, the machines are precisely the reason that Plaintiff AMD can provide the best pricing and service in the market for products requiring precision-straightened drill bit blanks.

6.      Plaintiffs treat their proprietary, confidential designs for the machines and their modifications, as well as their extensive know-how related to the operation and controls for the machines, as trade secrets and take reasonable measures to protect them as such.  Among other things, they require employees to sign non-disclosure agreements and require all suppliers and other visitors to their facilities to execute non-disclosure agreements before entering and viewing the machines.  Visitors are also prohibited from videotaping or photographing the machines. Moreover, the facilities, including the manufacturing area, are locked, requiring authorized badge access.  Computer systems require employee logins to access and only allow authorized users to see files.  Non-disclosure agreements are required for all authorized users.

7.      In April 2021, Plaintiff AMD contacted Defendant White's Bridge to make three replicas of its automatic-straightening machines with Plaintiff AMD's new and proprietary modifications and upgraded designs.  At the start of this process, Defendant White's Bridge's principal, Defendant Odland, visited Plaintiff AMD's facilities and executed a non-disclosure agreement, both on White's Bridge's behalf and in his personal capacity, to enter the building and proceed with the potential project.  *See* **Exhibit 1**, Odland April 29, 2021 NDA.  Throughout the process, Defendant Oland visited the facilities at least six more times, executing a non-disclosure agreement with every visit.

8.     After Defendant Odland's initial visit, Plaintiff AMD provided Defendant Odland and Defendant White's Bridge with proprietary specifications and drawings, all marked confidential and proprietary, subject to the non-disclosure agreements.

9.     After the parties' initial discussions, Plaintiff AMD issued a purchase order to Defendant White's Bridge that was subject to, and incorporated, Plaintiff AMD's Terms and Conditions of Purchase.  *See* **Exhibit 2**, June 1, 2021 Purchase Order.  Those Terms and Conditions included the following provisions on proprietary and confidential information: "(A) [White's Bridge] will consider all information furnished by [AMD] hereunder (including drawings, specifications, or other documents prepared by [White's Bridge] for [AMD] in connection with this Order) to be confidential and will not disclose any such information to any other person, or use such information itself for any purpose other than performing this Order, unless [White's Bridge] obtains [AMD's] prior written permission. [White's Bridge] will not advertise or publish the fact that [AMD] has contracted to purchase Goods from [White's Bridge], or disclose any information relating to the Order without [AMD's] written permission."  *See* **Exhibit 3**, AMD Terms and Conditions.[1]

10.     Defendant White's Bridge worked on and manufactured the machines for Plaintiff AMD.  Defendant White's Bridge is a contract manufacturer that does not have design responsibility, only building to suit customer needs and specifications. Without access to Plaintiffs' trade secrets, know-how, and proprietary information, Defendant White's Bridge could not have made the machines.  Defendant White's Bridge would, in fact, have had no need to make the machines but for Plaintiff AMD's request.  Plaintiff AMD directed Defendant White's Bridge

---

[1] The Terms and Conditions, which are available online, were identical to the attached at the time Defendant White's Bridge accepted the Purchase Order.

4

at every step, with Plaintiff AMD's educated and trained engineers providing the necessary details and specifications for Defendant White's Bridge to follow.

11.     During the first and second quarters of 2022, Defendant White's Bridge delivered the three machines to Plaintiff AMD.  Plaintiff AMD had no material issues with the machines and continued its relationship with Defendant White's Bridge.

12.     Plaintiff AMD had a longstanding relationship with Defendants Odland and White's Bridge that it thought was built on trust and professionalism.  Plaintiff AMD had worked with Defendants for decades.  From just 2018 to present, Plaintiff AMD provided Defendant White's Bridge with nearly $700,000 in business.

13.     Based on this relationship, Plaintiff AMD recently approached Defendants for a new project.  During a site visit to Defendant White's Bridge's facilities for this project, Plaintiff AMD's representatives noticed something curious: a machine that looked nearly identical to Plaintiff AMD's proprietary straightening machines – machines expressly incorporating Plaintiffs' trade secret and proprietary information, data, and designs.  Yet, Plaintiff AMD had not ordered any additional automatic straightening machines from Defendant White's Bridge.

14.     The explanation for this machine would soon become clear.  On June 2, 2024, Defendant White's Bridge had sent Plaintiff AMD a quote for the new project.  In reviewing the quote after the June 18 meeting, Plaintiff AMD noticed that Defendant White's Bridge *inadvertently referred to the "client" not as being Plaintiff AMD but rather as being Plaintiffs' biggest competitor in their industry:  Orchid Orthopedic Solutions ("Orchid").  See* **Exhibit 4**, June 2, 2024 Quote at 4.

15.     On or about June 18, 2024, Plaintiff AMD confronted Defendant Odland about the machine in its shop and the error in the quote.  Defendant Odland confessed that Defendant White's

Bridge had constructed a copy of Plaintiffs' proprietary automatic straightening machines, including engineering controls for use to achieve a specific drill, for Plaintiffs' competitor Orchid.

16.     Upon information and belief, Orchid approached Defendant White's Bridge, a small tooling company without any established presence in the medical-manufacturing industry beyond its work with Plaintiff AMD, because it learned that Defendant White's Bridge had done the tooling for Plaintiffs' innovative machines.

17.     Defendant White's Bridge saw this as an opportunity to profit from Plaintiffs' confidential, proprietary, trade secret designs by selling them to Plaintiffs' biggest competitor. Upon information and belief, Defendant White's Bridge built the machine including AMD's precise specifications, controls, and designs, conveying in the process Plaintiffs' confidential, proprietary, trade secret information.  Upon information and belief, Defendant White's Bridge has, and unless restrained, may seek out other of Plaintiffs' competitors to whom they would convey Plaintiffs' confidential, proprietary, trade secret designs.

18.     Plaintiffs now seek the Court's urgent intervention to stop the Defendants from profiting from its illicit selling of Plaintiffs' trade secrets to a third party competitor and most urgently to stop Defendant White's Bridge from providing or delivering to that competitor (or allowing the competitor to inspect) a machine that would allow the competitor to use the machine to make competing goods and further reverse engineer the machine to unfairly compete with Plaintiffs and further expose Plaintiffs' trade secrets.

## PARTIES

19.     Plaintiff AMD is a limited liability company with its global headquarters in Kentwood, Michigan.

20.     Plaintiff Southeastern is a wholly owned subsidiary of Plaintiff AMD, and is a Tennessee corporation.

21.     Defendant White's Bridge is a Michigan corporation with its principal place of business in Lowell, Michigan.

22.     Defendant Odland is White Bridge's president and upon information and belief, owns some or all of White's Bridge and resides in Lowell, Michigan.  Upon information and belief, Defendant Odland not only acted in his professional capacity, as a corporate officer of Defendant White's Bridge, but also acted in his personal capacity as he personally directed Defendant White's Bridge to breach Plaintiffs' confidences and misappropriate Plaintiffs' trade secrets, as complained herein.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1131 and 1338(a) as this action arises under, in part, the Defend Trade Secrets Act 18 U.S.C. § 1836.  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, as the state claims arise from the same common nucleus of operative fact as the federal claims.

24.     This Court has personal jurisdiction over Defendants because Defendant White's Bridge is a Michigan corporation headquartered in Michigan and Defendant Odland is a citizen of Michigan and their actions are resulting in irreparable and ongoing injuries suffered by Plaintiff AMD in Michigan.

25.     Venue is proper in the Western District of Michigan under 28 U.S.C. § 1391(b) as to all Defendants in that Defendants reside in this district and/or are otherwise subject to personal jurisdiction in this district and because a substantial part of the events giving rise to the claims at issue occurred in this district.

## FACTS

**A.    Plaintiffs Created the Innovative Straightening Machine, Whose Design and Modifications are Trade Secrets**

26.    Starting in 2016, Plaintiff AMD worked with its wholly owned subsidiary Plaintiff Southeastern to address a significant driver of their costs in manufacturing drill bit blanks for surgical tools:  the straightening process.

27.    Given their specific and important uses, surgical tools must be precise. Straightening drill bit blanks after the initial processes of machining and heat treating is a necessary part of ensuring precision.  Historically, the process for straightening drill bit blanks required the efforts of human straighteners to ensure that the drill bit blanks met the industry's high standards.

28.    Plaintiff Southeastern worked in collaboration with Plaintiff AMD to create machines to automate this process.  The automatic straightening machines were highly technical and complex machines that required specific training and experience to design.  Plaintiffs developed specific engineering recipes and experimented with iterations to improve on the logic of how the machine worked and how the operator interacted with the machine.  Plaintiffs had to iterate through specific details such as how to hold the part with sufficient rigidity such that it could be straightened without the part moving in the workholding device that secures it.  In creating the machines and the modifications, Plaintiffs developed proprietary and confidential specifications and drawings, engineering controls, materials and know-how that would take years to replicate independently.

29.    When Plaintiffs created the proprietary machines to automate this process, it was a game-changer.  Plaintiffs shaved production costs off these products that allowed them to lower their prices while maintaining quality and respectable profit margins.  Across the industry, manufacturers, including Plaintiffs' competitors, had struggled with automatic straightening with

no solution. Plaintiffs were the first ones – and to their knowledge the only ones – to solve the problem, despite the efforts of Plaintiffs' larger competitors.

30. The original machines are located at Plaintiff AMD's headquarters in Kentwood, Michigan. They are used solely and exclusively by Plaintiff AMD. They are not sold to anyone nor are the machines' details known to the public.

31. In 2021, as described below, Plaintiff AMD identified additional designs, upgrades, and modifications to the machines that improved their efficiency and utility. Plaintiff AMD directed Defendant White's Bridge to build three additional straightening machines according to these new designs, directing the work and specifications throughout the process.

32. Upon information and belief, no competitor has this technology. The machine designs and controls have immense value for this reason. Through Plaintiffs' innovation, they can underbid and outperform their competitors. Plaintiffs have invested significant time and resources, including countless hours over more than five years and north of a million dollars, in creating and refining the machine designs.

33. In Plaintiffs' experience, the innovative straightening machine designs and design modifications have been key in helping them secure substantial business over their competitors. In a competitive industry where customers hesitate to change the source of supply in medical device because of, among other things, the validation requirements, a decisive price advantage has been critical to Plaintiffs for competing with larger manufacturers.

**B.  Plaintiffs Take Reasonable Measures to Protect the Machine's Design and Design-Modifications Confidentiality**

34. The designs for the original machines and the modifications to the machines are confidential and proprietary. Plaintiffs treat the machine design, specifications, drawings, materials, and controls information related to the machines as trade secrets. All design drawings

were marked confidential and proprietary.  Before Plaintiff AMD engaged Defendant White's Bridge to replicate the original machines with modifications, the designs had only been shared with certain necessary parties who were subject to non-disclosures agreements.

35.    Indeed, Plaintiffs have gone to great lengths to protect these designs as they do their other confidential, proprietary information.  For instance, all employees relevant to the machines are covered by non-disclosures agreements and employees of Plaintiffs must execute a non-disclosure agreement, which existed in substantially the form attached here as **Exhibit 5** ("Employee NDA") during the relevant time period.  As outlined in **Exhibit 5**, employees agree, among other things:

     a.  "[A]t all times during and after . . . employment by the Company"  to "not disclose or use without prior written consent of the Company, either prior to, during, or subsequent to . . . employment, any secret, trade secret, proprietary or confidential information of the Company, its customers, or partners, which may include, at a minimum, inventions, improvements , processes, developments, discoveries, business methods , plans, know-how, customer or supplier accounts and contact lists, manufacturing processes or any confidential information relating to the intellectual  property or business of the Company or of third parties to whom the Company owes a duty of confidentiality all of which [the employee] obtain during [his or her] employment , whether or not developed by [employee] ('Confidential Information')."  *Id.* § 2; and

     b.  To "deliver to the Company,  upon termination of  . . . employment all devices, equipment, materials, property, keys, keycards, data, files, documents, drawings, blueprints, manuals, letters, notes, notebooks, reports, proposals, charts, records , plans, lists, customer contact information,  correspondence , emails, specifications, drawings,

design history files, tapes, films, graphics, computer media and all other material whether secret, proprietary or confidential nature or otherwise . . . , including copies, that relate to the Company's business[.]" *Id.* § 3(b).

36.    Additionally, when a vendor or any another third party visits Plaintiff AMD's facility in Kentwood that houses the machines, the party must have its video[2] taken and execute a non-disclosure agreement in the form that Defendant Odland executed and that is attached here as **Exhibit 1**.

37.    This agreement protects Plaintiff AMD's "Confidential Information" pertaining to AMD's "the business, products, services, processes, know how or technology" that "(a) is clearly labeled or otherwise identified in writing as confidential, (b) is identified orally as confidential at the time of disclosure or (c) would be apparent to a reasonable person, familiar with the [AMD's] business and the industry in which [AMD] operates, to be of a confidential or proprietary nature the maintenance of which is important to [AMD]." *Id.* § 1.1.

38.    The non-disclosure agreement provides that Confidential Information will "be held and maintained in the strictest confidence, will be used solely and exclusively for the purpose of evaluating a contemplated business relationship between the parties, and will not, directly or indirectly, be used for any other purpose whatsoever." *Id.* § 2.1.

39.    It also states that a party agrees that, with exceptions irrelevant here, "it will not, without the prior written consent of the [AMD], directly or indirectly, disclose all or any portion of the Confidential Information, or the substance thereof, to any third party[.]" *Id.* § 2.2.

---

[2] Plaintiff AMD's current check-in system captures videos of visitors to the facility.  In the past, it captured still images.

40.     The agreement states that a party "shall not "reverse-engineer, decompile, or disassemble any intellectual property disclosed to it . . . and shall not remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from any originals or copies of Confidential Information it obtains from [AMD.]" *Id.* § 3.4.

41.     The agreement further acknowledges that "a breach of any of the terms of this Agreement would cause irreparable harm to the [AMD] for which [AMD] could not be adequately compensated by money damages." *Id.* § 4.

42.     As further measures to protect their trade secrets, Plaintiffs prohibit visitors to Plaintiff AMD's Kentwood facilities from photographing or videotaping the machines and the facilities are locked and require badge access.

### C.     Plaintiff AMD Engaged Defendant White's Bridge to Replicate the Machines with Design-Modifications Subject to Non-Disclosure Agreements and the Purchase Order's Terms and Conditions

43.     In 2021, Plaintiff AMD wanted to create replications of the original automated straightening machines but with the benefit of Plaintiff AMD's new and proprietary designs and modifications.

44.     It engaged its long-time, *trusted* partner, Defendant White's Bridge to manufacture three replicate machines to its design and specification.

45.     After initial outreach in April 2021, Defendant White's Bridge's president Defendant Odland visited Plaintiff AMD's facility on April 29, 2021 to discuss the project and executed a non-disclosure agreement on his and Defendant White's Bridge's behalf.  *See* **Exhibit 1**, Odland April 29, 2021 NDA.   He then visited Plaintiff AMD's facilities at least six other times

between April 29, 2021, and November 15, 2021.  Each time, he executed a non-disclosure agreement identical to **Exhibit 1**.

46.     On June 1, 2021, Plaintiff AMD issued a purchase order subject to, and incorporating, its Terms and Conditions of Purchase, which includes a provision that "(A) [White's Bridge] will consider all information furnished by [AMD] hereunder (including drawings, specifications, or other documents prepared by [White's Bridge] for [AMD] in connection with this Order) to be confidential and will not disclose any such information to any other person, or use such information itself for any purpose other than performing this Order, unless [White's Bridge] obtains [AMD's] prior written permission. [White's Bridge] will not advertise or publish the fact that [AMD] has contracted to purchase Goods from [White's Bridge], or disclose any information relating to the Order without [AMD's] written permission."  *See* **Exhibit 2**, June 1, 2021 Purchase Order *with* **Exhibit 3**, AMD Terms and Conditions.

47.     Throughout the lifespan of the project, it was made clear repeatedly to Defendant Odland and Defendant White's Bridge that Plaintiff AMD's designs were proprietary and confidential.  The design drawings all contained stamping indicating their proprietary and confidential nature.  And Defendants acknowledged they were building the machines based on Plaintiff's original design and Plaintiff AMD's requested modifications

48.     During the first and second quarter of 2022, Defendant White's Bridge delivered the three machines to Plaintiff AMD.  As outlined above, Plaintiffs have reaped immense benefits from the competitive advantage their proprietary designs have provided in pricing and efficiency.

**D.      Upon Information and Belief, Defendant White's Bridge Betrayed Plaintiff AMD's Confidence**

49.     In May 2024, Plaintiff AMD reached out to Defendant White's Bridge to collaborate on a new machine project.

50.      On June 18 2024, representatives from Plaintiff AMD visited Defendant White's Bridge's facility in Lowell, Michigan to discuss the new project.

51.      During the visit, these representatives noticed a machine nearly identical to Plaintiffs' distinct, proprietary automatic straightening machines.

52.      When questioned about the machine, Defendant White's Bridges employees gave evasive, muddled answered.

53.      But the picture soon became clear to Plaintiffs.   On June 2, 2024, Defendant White's Bridge had sent Plaintiff AMD a quote for the new project.  See **Exhibit 2**, June 2, 2024 Quote at 4.  In a line at the bottom of the quote, Defendant White's Bridge inadvertently referred to Plaintiff AMD by the name of its biggest competitor: Orchid.  *See id.* at 4.  After the meeting on June 18, in reviewing the quote again, Plaintiff AMD noticed the reference to Orchid.

54.      After seeing the machine and reviewing the quote again, Plaintiff AMD put two and two together – the copy of its proprietary, confidential machines was destined for its competitor.

55.      On June 18, 2024, Plaintiff AMD confronted Defendant Odland about the machine that it saw at Defendant White's Bridge's shop, as well as the quote error.

56.      Defendant Odland confessed that the machine was indeed an automatic straightener for Orchid, which included complete engineering control for a specific drill.

57.      When Plaintiff AMD again confronted Defendant Odland on June 20, 2024, and demanded that he explain how Defendant White's Bridge came to build Plaintiffs' proprietary, confidential machine for a key competitor.  Odland asserted that Orchid approached Defendant White's Bridge stating that it had learned White's Bridge had constructed straightening machines for a competitor and wanted White's Bridge to provide such a machine to Orchid.  Defendant

White's Bridge also stated that it had interest in using the design to sell to other interested parties, if it could.

58.     On June 21, 2024, Plaintiff AMD spoke by phone with Defendant Odland again, as well as another representative from Defendant White's Bridge, Stephen Rivet, to discuss resolving the dispute over the machine built for Plaintiffs' competitor.  Defendants suggested Plaintiff AMD's purchasing White's Bridge as an option to resolve the dispute. They also intimated that, because of their work for Orchid, Plaintiff might learn about Orchid's own proprietary information were Plaintiff to acquire Defendant White's Bridge.  Plaintiff AMD immediately told Defendants to stop any discussion of Orchid's propriety information. When Plaintiff AMD asked for guarantees that the status quo would preserved while the parties tried to resolve the dispute, Defendants suggested that the machine would not be ready to ship to Orchid for "several weeks" but refused to commit to not shipping or delivering the machine, or allowing Orchid to inspect the machine in the interim.[3]

59.     In response to an email from Plaintiff AMD on June 21 demanding clarification on whether Defendants would agree to preserve the status quo while the parties tried to reach a resolution, Defendants again refused to expressly agree, instead repeating the evasive answer that the machine will not be ready to ship for several weeks.  See **Exhibit 6**, Odland June 24, 2024 Email.

60.     Upon information and belief, Defendant White's Bridge, a small tooling business in Lowell not generally known in the medical device machining industry, sensed an opportunity to capitalize on Plaintiffs' innovations and agreed to construct a machine for Orchid, in the process

---

[3] On this call, as in the June 20 meeting, Defendants implied that they had been trying to sell, and would like to sell, Plaintiffs' straightening machines to other third parties.

disclosing Plaintiff AMD's trade secrets in violation of federal and state law and their obligations under the non-disclosure agreements and the purchase order's Terms and Conditions. The nature of a machine project such as this in the industry would necessarily have involved Defendant White's Bridge's disclosing Plaintiff AMD's trade secret design and control information to the competitor during the process.

61.     Upon information and belief, as of the date of this filing, Defendant White's Bridge has not yet shipped or delivered the machine to Orchid.

62.     If the third party competitor secures the machine because Defendants deliver or ship it, in continued violation of the obligations described herein, Orchid will be ready to begin competing with Plaintiff AMD only because it was given improper access by Defendants.[4]  A direct competitor will be enabled to employ Plaintiff's proprietary automatic straightening technology to reduce its costs and will likely gain a clearer picture of Plaintiff's trade secrets, which could then be disseminated to procure more automatic straightening machines. Further, Defendants, if not enjoined, will likely continue to find new buyers for Plaintiffs' trade secret designs, thus destroying the protections Plaintiffs put in place.

63.     If Plaintiffs' trade secrets are made available to competitors, Plaintiffs will face the loss of its competitive advantage, market share, goodwill, and customers, who, given the nature of the industry, scarcely and infrequently change suppliers and likely would not return.  And what took Plaintiff over five years and over a million dollars to design and refine would fall into the hands of competitors who have been unable to replicate Plaintiffs' success independently.

---

[4] The undue competitive advantage would be substantial.  For instance, the engineering controls included with the machine destined for Orchid alone would typically take anywhere from 12 to 24 months to develop but will be improperly gifted to Orchid by Defendants, which has hundreds of drill SKUs.  Also, the machines apply to specific products that Plaintiffs manufacture for their customers in direct competition with Orchid at the SKU-level.

## COUNT I
### Federal Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act 18 U.S.C. § 1836
### *Against All Defendants*

64.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 61, as if fully set forth herein.

65.     Plaintiffs' confidential and proprietary information and trade secrets, including the machine designs and design modifications, have independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

66.     Defendants obtained this confidential, proprietary and trade secret information subject to non-disclosure agreements and obligations and with full knowledge about its confidential and proprietary nature.

67.     Upon information and belief, Defendant Odland directed Defendant White's Bridge to improperly, and without Plaintiffs' consent, give Orchid access to Plaintiffs' confidential, proprietary and trade secret information, including the machine designs and design modification, and to create a machine for Orchid, thereby giving Orchid an undue competitive advantage.

68.     Plaintiffs have made, and continue to make, reasonable efforts to maintain the secrecy of their confidential and proprietary information, and trade secrets, including the machine designs and design modification, including by using confidentiality agreements with employees, requiring confidentiality agreements with vendor and other visitors to its facilities, prohibiting photographs or videos of its machines, labeling of confidential documents, securing their facilities, and numerous other confidentiality measures, to protect such information.

69.     Upon information and belief, Defendants have, and continue to make use of, Plaintiffs' confidential, proprietary and trade secret information, including the machine designs

and design modifications, without express or implied consent, for their own benefit and for the benefit of Defendants.

70.     The extent and nature of Defendants' activities, as described above, demonstrate the willful and deliberate nature of these actions, and therefore constitute exceptional circumstances.

71.     As a direct and proximate result of the misappropriation of confidential and proprietary information and trade secrets by Defendants, Plaintiffs have suffered, continue to suffer, or will suffer in the future irreparable harm and injury, including loss of competitive advantage and loss of market share, and other injury and damages as to which there exists no adequate remedy at law.  Plaintiffs will continue to suffer this harm unless and until Defendants are enjoined from their unlawful behavior.

72.     As a direct and proximate result of Defendants' misappropriation of trade secrets and confidential and proprietary information, Plaintiffs have suffered, continues to suffer and will suffer in the future additional damages, which will continue to accrue, including, but not limited to the attorneys' fees and costs related to this litigation and loss of business in an amount to be proved at trial.

73.     Considering the willful, deliberate, and conscious nature of Defendants' actions in clear disregard for Plaintiffs' rights, Plaintiffs are entitled to recover exemplary damages in an amount to be determined at trial.

74.     Defendants have violated the Defend Trade Secrets Act 18 U.S.C. § 1836 by misappropriating Plaintiffs confidential, proprietary and trade secret information, and Plaintiffs are entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, disgorgement of Defendants' profits, attorneys' fees, and injunctive relief.

**COUNT II**
**Misappropriation of Trade Secrets**
**Under Michigan's Uniform Trade Secrets Act § 445.1901 *et seq.***
***Against All Defendants***

75.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 74, as if fully set forth herein.

76.     Plaintiffs' confidential and proprietary information and trade secrets, including the machine designs and design modifications, have independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

77.     Defendants obtained this confidential, proprietary and trade secret information subject to non-disclosure agreements and with full knowledge about its confidential and proprietary nature.

78.     Upon information and belief, Defendant Odland directed Defendant White's Bridge to improperly, and without Plaintiffs' consent, give Orchid access to Plaintiffs' confidential, proprietary and trade secret information, including the machine designs and design modification, and to create a machine for Orchid, thereby giving Orchid an undue competitive advantage.

79.     Plaintiffs have made, and continue to make, reasonable efforts to maintain the secrecy of their confidential and proprietary information, and trade secrets, including the machine designs and design modification, including by using confidentiality agreements with employees, requiring confidentiality agreements with vendor and other visitors to its facilities, prohibiting photographs or videos of its machines, labeling of confidential documents, securing their facilities, and numerous other confidentiality measures, to protect such information.

80.     Upon information and belief, Defendants have, and continue to make use of, Plaintiffs' confidential, proprietary and trade secret information, including the machine designs

and design modifications, without express or implied consent, for their own benefit and for the benefit of Defendants.

81.     The extent and nature of Defendants' activities, as described above, demonstrate the willful and deliberate nature of these actions, and therefore constitute exceptional circumstances.

82.     As a direct and proximate result of the misappropriation of confidential and proprietary information and trade secrets by Defendants, Plaintiffs have suffered, continue to suffer, or will suffer in the future irreparable harm and injury, including loss of competitive advantage and loss of market share, and other injury and damages as to which there exists no adequate remedy at law.  Plaintiffs will continue to suffer this harm unless and until Defendants are enjoined from their unlawful behavior.

83.     As a direct and proximate result of Defendants' misappropriation of trade secrets and confidential and proprietary information, Plaintiffs have suffered, continues to suffer and will suffer in the future additional damages, which will continue to accrue, including, but not limited to the attorneys' fees and costs related to this litigation and loss of business in an amount to be proved at trial.

84.     Considering the willful, deliberate, and conscious nature of Defendants' actions in clear disregard for Plaintiffs' rights, Plaintiffs are entitled to recover exemplary damages in an amount to be determined at trial.

85.     Therefore, Defendants, by using, receiving, and continue to use and receive Plaintiffs' confidential, proprietary and trade secret information are violating Michigan's Uniform Trade Secrets Act § 445.1901 *et seq.* and must be enjoined from such actions.  Plaintiffs are entitled

to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, disgorgement of Defendants' profits, attorneys' fees, and injunctive relief.

**COUNT III**
**Breach of Contract**
**Under Michigan Law**
*Plaintiff AMD Against Defendants*

86.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 85, as if fully set forth herein.

87.     On April 29, 2021, and on behalf of himself and Defendant White's Bridge, Defendant Odland executed a non-disclosure agreement in the form of the agreement attached as **Exhibit 1**.  He then executed it on his own and Defendant White Bridge's behalf at least six more times between April 29, 2021, and November 15, 2021.

88.     The agreements protect Plaintiff AMD's "Confidential Information" pertaining to AMD's "the business, products, services, processes, know how or technology" that "(a) is clearly labeled or otherwise identified in writing as confidential, (b) is identified orally as confidential at the time of disclosure or (c) would be apparent to a reasonable person, familiar with the [AMD's] business and the industry in which [AMD] operates, to be of a confidential or proprietary nature the maintenance of which is important to [AMD]." **Exhibit 1**, § 1.1.

89.     The non-disclosure agreements provide that Confidential Information will "be held and maintained in the strictest confidence, will be used solely and exclusively for the purpose of evaluating a contemplated business relationship between the parties, and will not, directly or indirectly, be used for any other purpose whatsoever." *Id.* § 2.1.

90.     They also state that the recipient agrees that, with exceptions irrelevant here, "it will not, without the prior written consent of the [AMD], directly or indirectly, disclose all or any portion of the Confidential Information, or the substance thereof, to any third party[.]" *Id.* § 2.2.

91.     The agreements state that a party "shall not "reverse-engineer, decompile, or disassemble any intellectual property disclosed to it . . . and shall not remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from any originals or copies of Confidential Information it obtains from [AMD.]" *Id.* § 3.4.

92.     The agreements further acknowledge that "a breach of any of the terms of this Agreement would cause irreparable harm to the [AMD] for which [AMD] could not be adequately compensated by money damages." *Id.* § 4.

93.     Plaintiff AMD provided Defendants with confidential information pertaining to the proprietary automatic straightening machine, including design materials stamped confidential and proprietary, as well as other information about design modifications and controls pursuant to the agreements that were either orally identified as confidential or that would have been apparent to Defendants that they were confidential.

94.     Upon information and belief, Defendants breached, at least, their obligations to keep this information in "the strictest confidence" to use it "solely and exclusively for the purpose of evaluating a contemplated business relationship between the parties," and to "not, directly or indirectly, be used for any other purpose whatsoever" by providing it to Orchid and using it to manufacture a machine for Orchid.

95.     Upon information and belief, Defendants intend to further violate the agreements unless enjoined by providing a copy of Plaintiffs' proprietary automatic straightening machine to Orchid and by soliciting other competitors.

96.     Defendants' unlawful actions must be enjoined to prevent loss of competitive advantage, market share, and other irreparable harm to Plaintiffs.

97.     Upon information and belief, the extent and nature of Defendants' activities demonstrate the willful and deliberate nature of its actions, and therefore constitute exceptional circumstances.

98.     Defendants' breaches are material. Plaintiff AMD is thus entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, attorneys' fees, and injunctive relief.

**COUNT III**
**Breach of Contract**
**Under Michigan Law**
*Plaintiff AMD Against Defendant White's Bridge*

99.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 98, as if fully set forth herein.

100.     Defendant White's Bridge accepted a purchase order dated June 1, 2024, and agreed to be bound by Plaintiff AMD's Terms and Conditions.  *See* **Exhibit 2**, June 1, 2024 Purchase Order *with* Terms and Conditions.

101.     In doing so, Defendant White's Bridge agreed to be bound the Terms and Conditions on proprietary, confidential information, including that:  "[White's Bridge] will consider all information furnished by [AMD] hereunder (including drawings, specifications, or other documents prepared by [White's Bridge] for [AMD] in connection with this Order) to be confidential and will not disclose any such information to any other person, or use such information itself for any purpose other than performing this Order, unless [White's Bridge] obtains [AMD's] prior written permission. [White's Bridge] will not advertise or publish the fact that [AMD] has contracted to purchase Goods from [White's Bridge], or disclose any information relating to the Order without [AMD's] written permission."  *See* **Exhibit 3**, AMD Terms and Conditions.

23

102.    Upon information and belief, Defendant White's Bridge breached its obligations to keep Plaintiff AMD's drawings, specifications, and other confidential information, as well as the drawings, specifications, and other documents prepared for Plaintiff AMD, confidential and to use this information only for performing the order by sharing the information with Orchid and using the information to manufacture a machine for Orchid.

103.    Upon information and belief, Defendant White's Bridge intends to further violate the agreement unless enjoined by providing a copy of Plaintiffs' proprietary automatic straightening machine.

104.    Defendant White's Bridge's unlawful actions must be enjoined to prevent loss of competitive advantage, market share, and other irreparable harm to Plaintiffs.

105.    Upon information and belief, the extent and nature of Defendant White's Bridge's activities demonstrate the willful and deliberate nature of its actions, and therefore constitute exceptional circumstances.

106.    Defendant White's Bridge's breaches are material.  Plaintiff AMD is thus entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, attorneys' fees, and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

A.  Judgment in favor of Plaintiffs on all claims asserted against Defendants;

B.  Emergency injunctive relief and permanent injunctions enjoining Defendants, and those acting in concert with any of them, as follows:

1. Enjoining and restraining Defendants from delivering or supplying the replica of Plaintiffs' proprietary machine or any other machines based on Plaintiffs' trade secret or confidential information to Orchid or any third party or allowing Orchid or any third party to inspect such machines;

2. Enjoining and restraining Defendants from violating the non-disclosure agreements;

3. Enjoining and restraining Defendants from using, disclosing, disseminating, revealing, misappropriating, or threatening to misappropriate Plaintiffs' confidential and proprietary information and trade secrets, including the machine designs, drawings, specifications, and design modifications;

4. Enjoining and restraining Defendants from otherwise unfairly competing with Plaintiffs, including but not limited to providing Plaintiffs' trade secrets to others;

C. An Order requiring Defendants to return to Plaintiffs all of Plaintiffs' trade secret, confidential and proprietary information and data, including Plaintiffs' machine designs and design modifications, and any other of Plaintiffs' property in Defendants' possession or custody or under their control;

D. An Order establishing a constructive trust over all compensation, profits, monies, accruals, increments, and other benefits Defendants obtained through their wrongful conduct and further requiring Defendants to disgorge and pay all such compensation, profits, monies, accruals, increments, and other benefits over to Plaintiffs;

E. An Order directing that an accounting be conducted of all business and benefits Defendants obtained as a result of their unlawful conduct, and awarding all such business and benefits to Plaintiffs;

F.   An Order awarding Plaintiffs money damages in an amount to be proven at trial;

G.   An Order awarding Plaintiffs exemplary or punitive damages in an amount to be proven at trial based upon Defendants' unlawful acts;

H.   An Order awarding Plaintiffs their costs and attorneys' fees incurred in bringing this action; and

I.   An Order awarding Plaintiffs such other relief as the Court deems just and proper.

## Verification

I verify, under the penalties of perjury, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

By: John Kennedy IV, in his capacity of Chief Technology Officer

On behalf of Autocam Medical Devices LLC, and Southeastern Technology, Inc.

Dated: June 27, 2024

Dated: June 27, 2024

Respectfully submitted,

HONIGMAN LLP

By: */s/ Patrick L. Rawsthorne*
Deborah J. Swedlow (P67844)
Patrick L. Rawsthorne (P81676)
200 Ottawa Avenue NW
Suite 700
Grand Rapids, MI 49503-2426
(616) 649-1900
bswedlow@honigman.com
prawsthorne@honigman.com